# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3458 | **DATE** | 6/15/2001 |
| **CASE TITLE** | EMMER J. ADAMS and JOHNNY G. MOORE vs. TRITON COLLEGE | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's Motion For Summary Judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JUN 18 2001 | | |
| ✓ | Docketing to mail notices. | | date docketed | 31 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | ED-7 FILED FOR DOCKETING 01 JUN 15 PM 4: 12 | date mailed notice | |
| EF | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EMMER J. ADAMS and JOHNNY G. )
MOORE, )
 )
   Plaintiff, )
 )
    v. ) Case No. 99 C 3458
 ) HONORABLE CHARLES R. NORGLE
TRITON COLLEGE )
   Defendant. )

**ORDER AND OPINION**

CHARLES R. NORGLE, Sr., District Judge:

Before the court are Defendant's motions for summary judgment on the complaint filed by

Emmer J. Adams and Johnny G. Moore. For the following the reasons, the motions are granted.

**I. BACKGROUND**

This case involves claimed violations of 42 U.S.C. 2000e-2(a)(1), et seq., and 42 U.S.C. §

1981.[1] The following facts are taken from all parties' statement of facts submitted in accordance

with Local Rule 56.1.

**A. Facts Regarding Emmer J. Adams**

Plaintiff, Emmer J. Adams ("Adams"), is an African-American female. Defendant, Triton

College ("Triton"), hired Adams in a full-time salaried position as a College Admissions Specialist

on August 3, 1987. Triton is a public, two-year college located in River Grove, Illinois. (Triton

College Profile, at http://www.trition.cc.il.us/admin/research/fastfact.html (last visited June 14,

2001)). Triton has an approximate enrollment of 21,711 students with 144 full-time and 488 part-

---

[1] The original complaint also contains a third allegation of age discrimination under 29
U.S.C. § 621. Plaintiff, Emmer J. Adams, has voluntarily dismissed this third allegation.

time faculty. Id. Adams remained with Triton over the years and earned several promotions and salary increases.

On September 25, 1995, Triton promoted Adams to Associate Vice-President of Affirmative Action and Human Resources. Triton considered this a "Level A Administrator" position. At the time of Adams' promotion, there were 12 other Level A Administrators who held separate and distinct positions with completely different responsibilities and salaries.

Within weeks of Adams' promotion to Associate Vice-President of Affirmative Action and Human Resources, she began to complain about the stress level and the amount of work involved with her new position. On October 18, 1995, a little over a month after Triton promoted Adams, the college hired Sean Sullivan ("Sullivan") to assist her. Sullivan's title was Affirmative Action, Human Resources and Equal Opportunity Assistant. Even after Triton hired Sullivan, Adams continued to complain about the stress and amount of work. Both parties admit that the relationship between Adams and Sullivan was contentious and that each complained of the other to colleagues and superiors. This situation was not helped by the fact that Triton eventually promoted Sullivan above Adams to Vice-President of Business Services in June of 1998.

In June of 1998, Triton undertook a reorganization of the Business Services Department. As a result of the reorganization, Triton offered a new title and job description to Adams: Associate Vice-President of Affirmative Action and Business Services. However, though Adams title and job description changed, her salary, benefits, and status as a Level A administrator did not. Sullivan, as Vice-President for Business Services, briefly discussed the new title and job description with Adams prior to their submission to the Board of Trustees of Triton. On June, 22, 1998, Adams directed a memorandum to Dr. George Jorndt ("Jorndt"), President of Trition College, indicating her

2

displeasure with her new title and job description. Within a few days, on June 26, 1998, Adams dispatched another memorandum to Jorndt, this time indicating that she was taking a leave of absence due to health reasons. The Board of Trustees of Triton formally offered Adams the position with a new title and job description on July 23, 1998. While on leave of absence, Adams submitted a letter of resignation on September 1, 1998. Six or seven months after Adams' resignation, Triton hired Robert Burnson as Associate Vice-President of Human Resources. The remaining affirmative action responsibilities previously performed by Adams were handled by Sullivan.

Adams filed charges of race and age discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 22, 1998. The EEOC issued Adams a right to sue letter on March 17, 1999 and she filed this action against Triton on May 25, 1999.

## B. Facts Regarding Johnny G. Moore

Plaintiff, Johnny G. Moore ("Moore"), is an African-American male. Triton hired Moore as a Computer Operator within its Information Systems Department in August of 1980. Moore's employment, based on his union membership, fell under the terms of the Classified Bargaining Unit's negotiated Agreements. In June of 1995, Triton promoted Moore to a Computer Systems Specialist. The position of Computer Systems Specialist is a Grade 11 position under the Collective Bargaining Agreement.

In the fall of 1998, Triton reorganized its Information Systems Department. As part of the reorganization, on September 8, 1998, Triton involuntarily transferred Moore from his Computer System Specialist position to the position of Audio-Visual Equipment Assistant in the Audio-Visual Department. At the time of Moore's transfer, Triton told him that he was being transferred for the good of the college.

3

Moore's transfer would move him from a Grade 11 to a Grade 6 salary position. Moore's Union voiced concern over this reduction because, this change from Grade 11 to Grade 6 violated Article V, § D(2) of the Collective Bargaining Agreement. Triton immediately changed its position and notified all parties that Moore's grade level would not change as a result of the involuntary transfer.

The next day, September 9, 1998, Moore took a medical leave of absence. Without ever returning to work a day in his new position, Moore submitted a letter of resignation. Moore filed charges of race discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 22, 1998. The EEOC issued a right to sue letter on March 16, 1999 and Moore filed this action in conjunction with Adams on May 25, 1999.

## II. DISCUSSION

### A. Standards for Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Shank v. William R. Hague, Inc., 192 F.3d 675, 682 (7th Cir. 1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. See e.g. Navarro v. Fuji Heavy Industries. Ltd., 117 F.3d 1027, 1030 (7th Cir. 1997). If the plaintiff fails

to come up with the required proof, the defendant is entitled to summary judgment. See id. It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. See Rand v. CF Industries, Inc., 42 F.3d 1139, 1146-47 (7th Cir. 1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment. See Fed. R. Civ. P. 56(c); Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); First Nat'l. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Amercian Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994) (citing Anderson, 477 U.S. at 249-50; 10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure: Civil § 2712, at 574-78 (2d ed. 1983)).

**B. Claims of Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(1) and 42 U.S.C. § 1981:**

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e-2(a)(1). Additionally, 42 U.S.C. § 1981 bars all racial discrimination

within the context of "making and enforcing contracts." In the context of employment discrimination, this right was also intended to include claims of harassment, discharge, demotion, promotion, transfer, retaliation and hiring. See 42 U.S.C. §§ 1981, 1981(b); Adams v. City of Chicago, 865 F. Supp. 445, 447 (N.D. Ill. 1994).

Adams and Moore can prove their racial discrimination cases with either direct evidence of discrimination, or indirectly through the burden shifting analysis of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See De Luca v. Winer Indus., 53 F.3d 793, 797 (7th Cir. 1995); see also Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000) (analyzing the McDonnell-Douglas test in an ADA/age discrimination case); Sample v. Aldi Inc., 61 F.3d 544, 547 (7th Cir. 1995) (citing Von Zuckerstein v. Argonne Nat'l Lab., 984 F.2d 1467, 1472 (7th Cir. 1993, cert. denied 510 U.S. 959 (1993)). Direct evidence of discrimination is "smoking gun" evidence, such as "we fired you because of your race." Robin, 200 F.3d at 1088. Because such evidence is rare, a plaintiff can also proceed using indirect evidence of discrimination and the McDonnell-Douglas burden shifting approach. Id. Under the burden shifting method, a plaintiff raises a presumption of discrimination by proving his prima facie case by a preponderance of the evidence. See id. The burden then shifts to the employer to articulate a legitimate non-discriminatory reason for its action. Id. If the employer does so, the presumption of discrimination disappears, and the plaintiff must prove by a preponderance of the evidence that the employer's stated reasons are a pretext for intentional discrimination. Id. Pretext means a lie. Specifically, the plaintiff must demonstrate that the employer's stated reason is phony or completely lacking a factual basis. Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1012-13 (7th Cir. 2000); Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000). Despite these shifting burdens of production, the ultimate burden of persuasion always

remains with the plaintiff. <u>Texas Dept. of Communtiy Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981). As the Seventh Circuit pointed out in <u>Robin</u>, the burden shifting framework is not a rigid analysis, rather it is tool for the court to determine the need for a trial. <u>Robin</u>, 200 F.3d at 1088-89. If a plaintiff does not have direct or indirect evidence that is conclusive in itself, the plaintiff may be able to defeat summary judgment by composing a convincing mosaic of direct and indirect evidence of discrimination. <u>Id.</u>

The parties dispute whether Adams and Moore have a prima facie case, but the court finds this case to be more appropriately analyzed under the <u>McDonnell-Douglas</u> approach. The court is not required to analyze the prima facie case. It can assume that a plaintiff has a prima facie case and proceed directly to the question of pretext. <u>See Jackson v. E.J. Brach Corp.</u>, 176 F.3d 971, 982 (7th Cir. 1999) (assuming that plaintiff met burden of establishing prima facie case and deciding the matter on pretext issue); <u>Debs v. Northeastern Ill. Univ.</u>, 153 F.3d 390, 395 (7th Cir. 1998) (same). Thus, the court assumes, without deciding, that both Adams and Moore have a prima facie case of racial discrimination. As discussed below, however, the court finds that Triton had legitimate reasons for its actions, and neither Adams nor Moore present evidence to the contrary.

Triton states a valid reason for creating a new title and job description for Adams – accommodating Adams' repeated complaints of stress related to the position of Associate Vice President of Affirmative Action and Human Resources. An employer may provide reasonable accommodations to an employee, such as job restructuring or reassignment, to enable an employee to perform the essential function of their job. <u>Cf. Tyler v. ISPAT Inland Inc.</u>, 245 F.3d 969, 973 (7th Cir. 2001) (ADA mandates that an employer make reasonable accommodations only if the accommodation would permit the disabled employee to perform his or her job); <u>Dalton, et al. v.</u>

<u>Subaru-Isuzu Automotive Inc.</u>, 141 F.3d 667, 674 (7th Cir. 1998) (same).  In this case, Adams

admits that she complained of stress and the amount of responsibility she was charged with while

she held the position of Associate Vice-President of Affirmative Action and Human Resources.

| | |
|---|---|
| Q: | Did you consider this to be a stressful job? |
| A: | Yes. |
| Q: | Did you consider this to be a lot of responsibility? |
| A: | Yes. |
| Q: | Did you ever voice your feelings that it was stressful or a lot of responsibility? |
| A: | Yes, I did. |
| Q: | To whom did you make those comments? |
| A: | Dr. George Jorndt and Sean Sullivan. |
| Q: | And when did you start making these comments to them? |
| A: | Let's see. Let me think back now. I would say November of – November or December of 1995. |
| Q: | So it was basically right after you started working in this position, correct? |
| A: | Correct. |
| Q: | And how often did you tell them that you thought the position was stressful and a lot of responsibility? |
| A: | Minimumly (sic) twice a month. |
| Q: | Did you ever do it in writing? |
| A: | Yes. |
| Q: | Do you have copies of those? |
| A: | I do. |
| Q: | Did you do it in memo form? |
| A: | Yes, I did. |
| Q: | How many written complaints did you make? |
| A: | At least four. |
| Q: | And do you recall the approximate date of those written complaints? |
| A: | No, I don't recall. |
| Q: | Other than the four written complaints, can you tell us how many time you verbally complained to them about the stress of this position? |
| A: | Weekly. |
| Q: | Although you said two times a month – so that's twice a month? |
| A: | I would say on paper twice a month. |

Q:    And weekly orally?

A:    Orally, at least.

(Def. Local Rule 56.1 Stmt. Adams, Ex. C pp. 52-54.)[2]  Further, Adams admitted that the position

of Associate Vice-President of Affirmative Action and Human Resources affected her  health, both

physically and emotionally.  Adams testified: "Well, emotionally, I am stressed out due to having

to perform two positions, having to work later hours, longer hours each week, not being able to

spend time with my family. Stressing me out because I have continually asked for help and did not

receive it." (Def. Local Rule 56.1 Stmt. Adams, Ex. C pg. 56.)  Eventually, Adams sought  treatment

from a doctor because of her job-related stress.  (Def. Local Rule 56.1 Stmt. Adams, Ex. C pp. 55-

56.)  Thus, Triton accommodated Adams by placing her in a position that encompassed some of the

duties she had previously performed without complaint, and yet still fulfilled Triton's needs.  Adams

retained her salary, seniority, and status as a Level A Administrator with the accommodation.

Triton states a valid reason for the involuntary transfer of Moore – an internal reorganization

and the best interest of the institution.  Cf. Bellaver v. Quanex Corp., 200 F.3d 485, 495 (7th Cir.

2000) (citing Gadsby v. Norwalk Furniture Corp., 71 F.3d 1324 (7th Cir. 1995) (Situations involving

a reduction-in-force where position is neither replaced nor absorbed do not demonstrate inferences

of discrimination from evidence that younger employees were treated more favorably because it did

not appear that the employer "selected the plaintiff for termination based on age from a group of

employees who were equally qualified.")).  In the fall of 1998, Triton reorganized its Information

Systems Department.  As part of that reorganization, Triton decided to transfer three persons from

---

[2] The parties have submitted separate sets of briefs for Plaintiff Emmer J. Adams and
Plaintiff Johnny G. Moore.  Each set of briefs had their own Local Rule 56.1 statement.  For
clarity the court will refer to a Local Rule 56.1 statement with a corresponding Plaintiff's name.

the Information Systems Department to other departments. Triton considered all employees in the Information Systems Department for the transfers, and decided that Santo Faso, Beverly Seaton, and Moore would be transferred. Moore admits that Triton informed him that as part of the reorganization of the Information Systems Department he was to be transferred based on the best interest of the institution. (Def. Local Rule 56.1 Stmt. Moore ¶ 15; Ex. C pp. 28-29; Ex. J pg. 39; Ex. I pp. 9-10.) At a September 8, 1998 meeting, Sean Sullivan, Acting Director of Human Resources and Vice-President of Business Services, Kevin Kennedy, Dean of Information Services, Marge Stabile, Moore's supervisor, and Donna Stadermann, Moore's Classified Union Representative, informed Moore of his involuntary transfer. (Def. Local Rule 56.1 Stmt. Moore ¶ 14). The involuntary transfer moved Moore from Computer Systems Specialist to Audio-Visual Equipment Assistant. (Def. Local Rule 56.1 Stmt. Moore ¶ 15). It is unrefuted that Triton considered Moore along with all the other Computer Systems Specialist for the position of Audio-Visual Equipment Assistant position. (Def. Local Rule 56.1 Stmt. Moore ¶ 13).

Thus, the question becomes whether Adams or Moore have evidence that Triton lied about its actions. See Paluck, 221 F.3d at 1012-12 (discussing pretext); Jordan, 205 F.3d at 343 (same). Or in other words, was Triton's stated reasons a pretext for illegal discrimination. The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000) (citing Jackson, 176 F.3d at 984; Crim v. Board of Educ., 147 F.3d 535, 541 (7th Cir. 1998); Bahl v. Royal Indem. Co., 115 F.3d 1283, 1291-92 (7th Cir. 1997)). The court does not "sit as a superpersonnel department that reexamines an entity's business decision." Stewart, 207 F.3d at 378. The only "concern is whether the legitimate reason provided by the employer is in fact the true one." Id.

Unless this nondiscriminatory explanation is false -- not just an overreaction, but a lie -- Triton must prevail. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 130, 146-149 (2000); Wade v. Lerner New York, Inc., 243 F.3d 319, 323-24 (7th Cir. 2001); Ritter v. Hill 'N Dale Farm, Inc., 231 F.3d 1039, 1044-45 (7th Cir. 2000); Kulumani v. Blue Cross Blue Shield Association, 224 F.3d 681, 684 (7th Cir. 2000); see also Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 890 (7th Cir. 1997) (employer prevails if it "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless."). As stated in Robin, Adams or Moore can survive summary judgment if they present a mosaic of evidence of discrimination from which a jury could infer that Triton was lying. See Robin, 200 F.3d at 1088-89.

The court has culled from Adams' and Moores' throughly confusing responses an attempt to present a mosaic with the following evidence: Adams' mosaic consists of her allegations that she was (1) treated differently than other similarly situated Associate Vice-Presidents in terms of salary and demotion; (2) replaced by a white male who was paid more for a position that entailed less responsibility; and (3) Sullivan's racial animus towards Adams, which he demonstrated in his comments and actions in front of Roy McCampbell ("McCampbell) and Mary Jane Genevieve Goldwaithe ("Goldwaithe"), contributed to her new title and job description. Moore's mosaic consists of his allegations that he was (1) treated differently than other similarly situated Computer System Specialist; and (2) Sullivan's racial animus towards Moore, which he demonstrated in his comments and actions towards Emmer Adams as well as his comments and actions in front of McCampbell and Goldwaithe, contributed to his involuntary transfer. The court addresses each of Adams' and Moores' contentions and finds that both fail to raise any question of material fact.

11

### 1. Sullivan's Animus

Initially, the court addresses the argument that both Adams and Moore share, that of Sullivan's alleged racial animus. The court rejects Adams' and Moores' arguments that Sullivan's apparent racial animus towards them contributed to Adams' new title and job description or Moore's involuntary transfer. To be probative of discrimination, isolated comments must be contemporaneous with an adverse employment action or causally related to the adverse employment action decisionmaking process. See Geier v. Medtronic, Inc., 99 F.3d 238, 242 (7th Cir. 1996) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J, concurring)); Jasmantus v. Subaru-Isuzu Automotive, Inc., 139 F.3d 1155, 1157 (7th Cir. 1998); Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467-68 (7th Cir. 1998) (relatively isolated comments suggesting bias against ethnic minorities insufficient to survive summary judgment). There must be a real link between the alleged bigotry and the adverse employment action. Gorence, et al. v. Eagle Food Centers, Inc., 242 F.3d 759, 762 (7th Cir. 2001) (citing Miller v. American Family Mut. Ins. Co., 203 F.3d 997 (7th Cir. 2000)). A discriminatory remark is considered "stray" when it is unrelated to the employment decision. See Gorence, 242 F.3d at 762 (citing Cianci v. Pettibone Corp., 152 F.3d 723,727 (7th Cir. 1998); Fuka v. Thomson Consumer Elec., 82 F.3d 1397, 1403 (7th Cir. 1996)); see also Hoffman v. MCA, 144 F.3d 1117, 1121-22 (7th Cir. 1998) (plaintiff must show that remarks were related to the employment decision in question); Robinson v. PPG Indus., 23 F.3d 1159, 1165-66 (7th Cir. 1993) (same); McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686-87 (7th Cir. 1991) (same). The Seventh Circuit has cautioned:

> Our cases should not be overread to mean that "stray remarks" of a derogatory character are never evidence of discrimination. What our cases hold, we said, is that if someone not involved in the

decisionmaking in a plaintiff's case expressed discriminatory feelings, that is not evidence that the decision was discriminatory. It is different, we said,

> when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of.

Gorence, 242 F.3d at 762 (citing Hunt v. City of Markham, Ill., 219 F.3d 649, 652 (7th Cir. 2000)). In this case, Sullivan's allegedly discriminatory statements or actions are not contemporaneous or in reference to Adams' new title and job description or Moore's involuntary transfer.

Moreover, conclusory allegations of generalized racial bias do not establish discriminatory intent. Minority Police Officers v. South Bend, 801 F.2d 964, 967 (7th Cir. 1986); see also United States v. Ravich, 421 F.2d 1196, 1204 n. 10 (2nd Cir. 1970) (the length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence and may therefore render it more susceptible to exclusion as unduly confusing). Nor does the subjective feeling of an individual raise a genuine issue of material fact. Cf. Bullock v. Board of Trustees of Univ. Of Ill., No. 93-7123, 1996 WL 221197 at *5 (N.D. Ill. Apr. 30, 1996); Flowers v. GoldmanSach & Co., 865 F. Supp. 453, 455 (N.D. Ill. 1994). Adams' and Moores' allegation of Sullivan's racial animus involves McCampbell, a former Vice-President of Services at Triton, and Goldwaithe, a former Triton employee who worked with Sullivan and Adams.[3] Adams and Moore cite several alleged statements of McCampbell's and portions of his deposition testimony in which McCampbell stated that Sullivan had a history of problems with

---

[3] The court notes that McCampbell and Goldwaithe are married and that Goldwaithe currently has a sexual harassment suit pending against Triton and Sullivan.

African-Americans, Sullivan is a racist, and that Sullivan attempted to force Adams out of a job.[4] Each of the alleged instances of racial animus are merely conclusions made by McCampbell based on his perception rather than facts admissible at trial.

There is one statement allegedly made by McCampbell that is not a conclusion; that Sullivan told McCampbell he had changed Adams' job description in order to make it demeaning and have her quit. (Def. Local Rule 56.1 Stmt. Adams, Ex. C pp. 90.) The court notes that this statement, even though Adams attributes it to McCampbell, is actually offered through the deposition testimony of Adams. Thus, it is, at best double hearsay. More disconcerting to the court is the fact that McCampbell did not testify to this in his deposition. In fact, during McCampbell's deposition, he testified:

> Q: Just to clarify your earlier testimony, am I correct that you never had any discussions with Mr. Sullivan about the creation of a job description for Miss Adams as associate vice president of business services; is that correct?

---

[4] Contained in Adams' response are five references to the statements or deposition testimony of McCampbell that concern Sullivan:

1) "From the day that Sean Sullivan walked in the building, we had troubles." (Def. Local Rule 56.1 Stmt. Adams, Ex. G pg. 79.)

2) "Sean Sullivan had a history of problems with black women and had problem with Johnny Moore which appeared to be racially motivated." (Def. Local Rule 56.1 Stmt. Adams, Ex. G pp. 26-27, 29.)

3) McCampbell told [Adams] that Sullivan had advised him that he was changing the job description to make it demeaning and to put things in there that he knew [Adams] wouldn't like; and [Adams] is a smart lady, so she will turn it down. (Def. Local Rule 56.1 Stmt. Adams, Ex. C pg. 90.)

4) McCampbell said that Sullivan changed the job description because he is racist. (Def. Local Rule 56.1 Stmt. Adams, Ex. C pg. 91.)

5) McCampbell noted that Sullivan had made repeated attempts to write job descriptions which would put [Adams] out of a job in human resources but was unsuccessful during his tenure. (Def. Local Rule 56.1 Stmt. Adams, Ex. G pp. 92-93.)

14

A: That's correct.

(Def. Local Rule 56.1 Stmt. Adams, Ex. G pg. 100.) Thus, Adams' self serving statement is entirely unfounded. Again, Adams and Moore have the burden to present evidence that could persuade a jury to accept their version of events. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030. McCampbell's deposition testimony and alleged statements are mere speculation, which is insufficient to defeat summary judgment. See Rand, 42 F.3d at 1146-47 (noting that something more than hunches and speculation is necessary to survive summary judgment).

In terms of Goldwaithe's deposition testimony, there is substance but little connection to Adams and Moore. Goldwaithe testified to several statements made by Sullivan, either to her or to other individuals she overheard.[5] However, all of the remarks that Goldwaithe testified to are not contemporaneous nor are they causally linked to the adverse action. See Geier, 99 F.3d at 242 (7th Cir. 1996); Gorence, 242 F.3d at 762; Ngeunjuntr, 146 F.3d at 467-68. Goldwaithe admits that all the instances in which Sullivan allegedly made comments occurred in 1996, two years prior to Triton's offer of a new title and job description to Adams and the involuntary transfer of Moore. Further, out of the four alleged remarks that Goldwaithe testified about, only two were specifically

---

[5] Contained in Adams' response are four references to the Goldwaithe deposition testimony concerning Sullivan:

1) Goldwaithe was told by Sullivan that he became president of the NAACP in college so that no one would be able to say that he was a racist. (Pltff's Local Rule 56.1 Stmt. Adams, Ex. 1 pp. 23-29.)

2) Goldwaithe also heard Sullivan refer to a black woman as "that stupid nigger." (Pltff's Local Rule 56.1 Stmt. Adams, Ex.1 pp. 25-26.)

3) Goldwaithe also heard Sullivan joke about how he could handle the problems in the staff services office as he was a white guy and how Adams could not as a black person control her people. (Pltff's Local Rule 56.1 Stmt. Adams, Ex. 1 pg. 27.)

4) Goldwaithe heard Sullivan constantly disparage Plaintiff before others. (Pltff's Local Rule 56.1 Stmt. Adams, Ex. 1 pp. 39-43.)

directed at Adams and none were directed at Moore. See McPhaul v. Board of Commissioners, 226 F.3d 558, 567 (7th Cir. 2000) ("when harassing statements are 'directed at someone other than plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at plaintiff.'"). Obviously, the alleged remarks of Sullivan are entirely condemnable and unredeemable. Yet none of them are contemporaneous or in reference to a new title or job description for Adams or the involuntary transfer of Moore. See Greier, 99 F.3d at 242; Gorence, 242 F.3d at 762 ; Ngeunjuntr, 146 F.3d at 467-68. Additionally, Sullivan was not the ultimate decision maker in terms of Adams' new title and job description. The Board of Trustees had to approve or reject Adams' new title and job description. Sullivan had input in the decision since he wrote the title and description. But again the remarks were made in 1996 and in no way were in reference to the new job title and job description. Id. Based on the Seventh Circuit's holding in Gorence, such remarks are not evidence of discrimination. Next the court will examine the distinct claims of Adams and Moore.

### 2. Adams' Claims

The court rejects Adam's argument that discrimination is shown by the fact that Triton treated her differently than similarly situated Associate Vice-Presidents in terms of salary and demotion. "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-[African-American] employees, the plaintiff must show that the 'comparables' are similarly situated in all respects." Spath v. Hayes Wheels Int'l-Indiana, Inc., 211 F.3d 392, 397 (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (7th Cir. 1992)). A Title VII plaintiff cannot defeat summary judgment with his or her own uncorroborated, conclusory statements that similarly situated co-workers were treated differently. See Oest v. Ill. Dept. of Corrections, 240 F.3d 605, 614

(citing <u>Bragg v. Navistar Int'l Transp. Corp.</u>, 164 F.3d 373, 377 (7th Cir. 1998); <u>Cowan v. Glenbrook Sec. Servs., Inc.</u>, 123 F.3d 438, 446 (7th Cir. 1997)).

It is true that Adams was the only African-American Associate Vice-President at Triton College from 1995-1998. But, Adams' presents no evidence that she was paid or demoted differently than similarly situated Associate Vice-Presidents. First, the record reflects that there were 12 Level A Administrators who had different salaries based on different job responsibilities. (Def. Local Rule 56.1 Stmt. Adams, Ex. E). Adams fails to even identify which of the Level A Administrators are similarly situated to her. The only evidence Adams provides is her statement "that others outside her protected class were treated more favorably than her in similar circumstances in terms of salary and demotion." (Pltff. Adams' Response pg. 13.) Adams does not provide any specifics as to names, responsibilities, salaries, or promotions and demotions of Level A Administrators.

The record also reflects that when Triton promoted Adams to Associate Vice-President, or a Level A Administrator, she received a salary of $55,000 which was a $10,000 increase over the salary she had previously earned eight months before as a Level B Administrator.[6] After Adams' promotion, she routinely received salary increases that were comparable percentage-wise with the salary increases for other Level A Administrators.[7] In July of 1998, Adams' salary, as well as four

---

[6] Although $55,000 was the minimum salary for a Level A administrator, the salary was based on the 10% floor dictated by the Administrative manual for salary increases and the market value for her position. Based on Adams' salary for the Level A Administrator position, she received an 15% increase in salary. (Def. Local Rule 56.1 Stmt. Adams, Ex. E and Ex. F pp. 47.)

[7] Adams received a salary increase to $57,173.00 on July 1, 1996, another increase to 59,363.00 on July 1, 1997, and another increase to $62,400.00 on July 1, 1998. Adams percentages of increase in salary are the following: 1995 = 15% increase; 1996 = 4% increase;

17

other Level A Administrators, increased to $62,400.[8] Adams' July 1998 salary increase was greater percentage-wise than the salary increases of at least three of the other Level A Administrators.[9] Moreover, contrary to Adams' briefs, Trition never demoted Adams from a Level A Administrator. (Def. Local Rule 56.1 Stmt. Adams, Ex. E). Adams does not refute any of these facts. Adams has the burden to present evidence that could persuade a jury to accept her version of events. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030. Adams' allegations are speculation, which is insufficient to defeat summary judgment. See Rand, 42 F.2d at 1146-47 (noting that something more than hunches and speculation is necessary to survive summary judgment). Rather than demonstrating discrimination, the facts of record indicate that Trition treated Adams the same or better than other Level A Administrators.

The court also rejects Adams' argument that discrimination is shown by that fact that Triton replaced Adams with a white male who was paid more for a position that entailed less responsibility. Adams took a leave of absence beginning on June 26, 1998, and voluntarily submitted her letter of resignation on September 1, 1998 without ever returning to work. (Def. Local Rule 56.1 Stmt. Adams ¶ 23 & 24). Six to seven months later Triton hired Robert Burnson ("Burnson") as Associate

-------------------

1997 = 4% increase; and 1998 = 5% increase (all percentages are rounded accordingly). Out of all of the Level A Administrators, Adams received comparable percentage-wise salary increases, if not above average. Further, only one other Level A Administrator, Joseph Tidei, received a comparable percentage-wise salary increase to Adams in 1998. (Def. Local Rule 56.1 Stmt. Adams, Ex. E).

[8] The four other Level A Administrators were: Sean Sullivan (white); Dorene Wiese (American-Indian); Douglas Olson (white); and Joseph Tidei (white). (Def. Local Rule 56.1 Stmt. Adams, Ex. E).

[9] The only other Level A Administrator to receive a comparable percentage-wise salary increase to Adams was Joseph Tidei. (Def. Local Rule 56.1 Stmt. Adams, Ex. E).

Vice-President of Human Resources. (Def. Local Rule 56.1 Stmt. Adams ¶ 27). Burnson, who is white, received a salary of $63,500. (Def. Local Rule 56.1 Stmt. Adams, Ex. F. pp. 17-20.) On these facts, Adams claims that Brunson was hired at a higher salary for a position she held at a lower salary. The court finds Adams' argument particularly weak. Adams does not present any evidence as to Brunson's job responsibility, his experience level, or standard salary increases. Indeed, Burnson had over 20 years of human resource experience compared to Adams' three years.[10] First, Adams voluntarily left her position in September of 1998. Obviously, Triton would not have been forced to hire Burnson had she not voluntarily resigned. Second, the court must consider not only the time that Burnson was hired, but his individual qualifications.

Even construing all of the evidence together, Adams fails to raise a question of fact for trial. Adams admits that she continually complained of the stress she was under in her position as Associate Vice-President of Affirmative Action and Human Resources which affected both her mental and physical health. The stress reached a level great enough for Adams to seek the aid of a doctor. Based on these facts, Triton was justified to offer Adams a new title and job description to relieve her stress. Adams does not present any evidence that Triton lied about these facts. The arguments she presents are based on her own conclusions rather than admissible evidence.

---

[10] Adams argues that she has more years of experience in human resources and cites to a job she held in the 1960's and early 1970's when she worked in the human resources department of an insurance agency. Unfortunately, she worked as a receptionist and then a counselor (Adams stated she "looked at the application, passed that on to the director of human resources, and did the first round of interviews."). Neither position offered her much in the way of human resource experience. (Def. Local Rule 56.1 stmt. Adams, Ex. C pp 10-14.)

### 3. Moore's Claims

The court rejects Moore's argument that discrimination is shown by the fact that he was treated differently than other similarly situated Computer Systems Specialist based on his transfer. Moore's claim is unsupported by any evidence in the record. Moore has the burden to present evidence that could persuade a jury to accept his version of events. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030. "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-[African-American] employees, the plaintiff must show that the 'comparables' are similarly situated in all respects." Spath, 211 F.3d at 397 (quoting Mitchell, 964 F.2d at 583). Three involuntary transfers, including Moore's, resulted from Triton's reorganization of the Information Systems Department. (Def. Local Rule 56.1 Stmt. Moore ¶ 12). Beverly Seaton (white) was involuntarily transferred from a Data Control Technician position to a Secretarial position. Santo Faso (white) was involuntarily transferred from a Computer Operator position to an Audio-Visual equipment assistant. (Def. Local Rule 56.1 Stmt. Moore ¶ 12). However, as Moore points out, neither of these individuals were similarly situated to him. The Information Systems Department at Triton contained five Computer Systems Specialist, including Moore: Larry Barzuski (white); Barbara Bester (African-American); Barb Lestrol (white); and Joe Tomasek (white). (Def. Local Rule 56.1 Stmt. Moore ¶ 13). Triton considered all five Computer Systems Specialist for the transfer to the position of Audio-Visual Equipment Assistant. (Def. Local Rule 56.1 Stmt. Moore ¶ 13). This includes Barbara Bester, an African-American and Computer Systems Specialist, for the transfer to the position of Audio-Visual Equipment Assistant. Triton did not transfer Ms. Bester. Moore does not refute any of these facts. The only evidence the court can find in the tangled web of Moore's response is the argument that Ms. Bester was not similarly situated because she worked

a different shift. Yet, Ms. Bester has the same title, job description, and grade level as Moore. Additionally, it is unrefuted that Triton considered all of the Computer Systems Specialist for the involuntary transfer to Audio-Visual Equipment Assistant position. This includes Bester. The fact that Triton did not transfer Bester makes Moore's argument self-defeating.

Even construing all of the evidence together, Moore fails to raise a question of fact for trial. Moore admits that Triton was reorganizing the Information Systems Department. It is unrefuted that Triton considered all of the Computer Systems Specialist for the audio-visual equipment position. This included Bester, an African-American, who had the same job title, job description, and grade level. Moore does not present any evidence that Triton lied about these facts, or took any action to discriminate against him because of his race.

### III. CONCLUSION

For the foregoing reasons, Defendant's motions for summary judgment is granted.


IT IS SO ORDERED


ENTER:

CHARLES RONALD NORGLE, SR. Judge

United States District Court


DATED: 6/14/01